IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

HOLLY WATSON,             )
                      )
      Plaintiff,        )
                      )
v.                    )     CIVIL ACT. NO.  2:10CV447-CSC
                      )              (WO)
LINCARE, INC., *et al.*,    )
                      )
      Defendants.     )

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

The plaintiff, Holly Watson ("Watson"), a former employee of Lincare, Inc., brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), alleging that she was subjected to discrimination based on her sex.  Specifically, she alleges that she was subjected to sexual harassment, a hostile work environment and was constructively discharged from her employment.  Watson also asserts state law claims of invasion of privacy, assault and battery, the tort of outrage, and negligent supervision.  She names Lincare, Inc., ("Lincare") and Derrick Stewart ("Stewart") as defendants.

This action is pending before the court on the defendants' motion for summary judgment.  The court has carefully reviewed the motion for summary judgment, the briefs, and the supporting and opposing evidentiary materials and concludes that the defendant's motion for summary judgment is due to be granted.

## II.  THE STANDARD OF REVIEW

Under FED. R. CIV. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[1]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.

The movant may meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-324.  If the movant succeeds in demonstrating the absence of a material issue of fact, the

---

[1]  In *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the court stated:

"[Where the nonmoving party will bear the burden of proof at trial on a dispositive issue...Rule 56(e)...requires the nonmoving party to go beyond the pleadings and by...affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate  "specific facts showing that there is a genuine issue for trial. . . .We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment...Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c) except the mere pleadings themselves. . . .

*Id.* at 324.

burden shifts to the non-movant to establish, with evidence beyond the pleadings, that a genuine issue material to the non-movant's case exists. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-17 (11th Cir. 1993)("When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of [his] pleading, but [his] response ... must set forth specific facts showing that there is a genuine issue for trial."); *see also* Fed. R. Civ. P. 56(e).  What is material is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

A dispute of material fact "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the non-movant must present "affirmative evidence" of material factual conflicts to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257.  If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant. *See Holifield v. Reno*, 115 F.3d 1555, 1564 n. 6 (11th Cir. 1997); *Harris v. Ostrout*, 65 F.3d 912 (11th Cir. 1995).

However, if there is a conflict in the evidence, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *Ruiz de Molina v. Merritt & Furman Ins. Agency*, 207 F.3d 1351, 1356 (11th Cir.

2000).  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  With these principles of law in mind, the court will determine now whether summary judgment is appropriate and should be granted.

## III. FACTS

Viewed in the light most favorable to the plaintiff and drawing all reasonable inferences in her favor, the following facts are treated as undisputed for the purpose of summary judgment.  Watson began working as a customer service representative at Lincare, a respiratory equipment company, on May 3, 2006. (Defs' Ex. C, Mark Schuetzler's Affid., p. 2.)  Shortly after being hired, Watson received an employee handbook, which included Lincare's policy on harassment and discrimination in the workplace, and watched an orientation video entitled "More than Mischief (Sexual Harassment at Work)."  (Pl's Dep., pp. 45, 67-69;  Attach. to Scheutzler's Affid., Exhs. 1 & 18.)  She also received updated employee handbooks in 2007 and 2008 (Pl's Dep., p. 69;  Attach. to Schuetzler's Affid., Exhs. 4 & 7.)

In addition to listing prohibited conduct, the policy encouraged Lincare's employees to report incidents of harassment to the regional manager, employee relations director, or human resources manager.  (Attach. to Schuetzler's Affid., Ex. 7, p. 17.)  The policy also

4

listed the steps an employee should take when reporting a problem to management.  (*Id.*, pp. 20-21.)  Watson was also advised of Lincare's toll free complaint number, which an employee may use to report incidents of sexual harassment anonymously.  (Pl's Dep., pp. 83-84.)

On occasion, employees at Lincare, including Watson's supervisor, Stewart, would "pop" each other on the backside in a manner similar to football players congratulating each other on the sidelines.  (Pl's Dep., p. 145.)  This happened a lot around the Andalusia office and no one, including Watson, gave it much thought.  (*Id.*, p. 145-146.)  Watson never reported these activities to anyone.  (*Id.,* p. 146)  One day, however, Watson's thoughts about the work environment and her own personal life while employed at Lincare changed.

At some point in 2006 or 2007, Watson began to suspect that her husband was having an affair.  (*Id.*, p. 31.)  She turned to her immediate supervisor, Stewart, who was also a minister or a student of ministry for guidance and confided in him her suspicions about her husband's unfaithfulness.  (*Id.*)

Shortly thereafter, Stewart's behavior toward Watson changed.  On one occasion in 2006 or 2007, Stewart called Watson into his office, pulled up her shirt, and began fondling and sucking on her breasts.  (Pl's Dep., p. 152-154.)  During the encounter, another employee transferred a phone call for Watson into Stewart's office.  (*Id.*)  Watson answered the phone.  (*Id.*)  Despite the interruption, Stewart continued to fondle Watson's breasts.  (*Id.*)  After hanging up the phone, Stewart told Watson that her breasts were pretty.  (*Id.*)  Watson did

not tell him to stop because she feared losing her job.  (Pl's Dep., p. 157.)  She told no one about this incident.  (*Id.*, p. 159)

On another occasion, Stewart placed his hand on Watson's upper thigh while sitting next to her at a desk.  (Pl's Dep., p. 165.)  In early 2007, Stewart suggested that he and Watson could have sex on a hospital bed in the office.  (*Id.*, p. 131-132.)  An actual encounter in this manner, however, did not occur.

On March 6, 2008, Lincare moved its center to a new location in Andalusia.  (Defs' Ex. C, Schuetzler's Affid., p. 2.)  At some point after moving into the new office, Stewart walked over to Watson's desk, told Watson to give him a kiss, and leaned over and kissed her on the mouth. (Pl's Dep., p. 135, 137-139.)  The next day, Stewart kissed Watson in the same manner.  (*Id.*, p. 138.)  On at least three other occasions, Stewart called Watson into his office and fondled her breasts.  (Pl's Dep., pp. 159-160.)  He also talked about her breasts on several occasions.  (*Id.*, p. 150.)

In June 2008, Stewart told Watson that she could come over to his house and have sex with him that evening because his wife and children were at church camp.  (*Id.*, pp. 124-125.)  Stewart cancelled the invitation upon learning that he had company coming over to his house that night.  (*Id.*, p. 125.)  Watson did not complain to management about Stewart's behavior. (*Id.*, pp. 127, 165, 168, 172, 237.)

In early March 2009, Watson and Krissy Robbins ("Robbins"), a co-worker, went to dinner together with their husbands.  During dinner, Watson confided to Robbins that Stewart

had done some things to her that she did not like and asked her not to tell anyone.  (Pl's Dep., p. 90.)  A few days after their conversation, Watson submitted a letter of resignation to Stewart.  The letter stated:

> I am putting my 2 week notice in effective immediately.  The job that I was hired for does not hold the interest or satisfaction that it once did.  There is nothing that Lincare can do to change it.  I'm just no longer happy at my workplace.

(Attach. to Schuetzler's Affid., Ex. 1.)   On or around the day Watson submitted the letter, Stewart walked by Watson and said that "it would be hard to replace somebody that has as pretty titties as [she] had."  (Pl's Dep., p. 121.)

Shortly after Watson submitted her letter of resignation, Robbins told Stewart that Watson kept a notebook of all the times that he allegedly sexually harassed her and that she planned to file a lawsuit.  (Stewart's Dep., p. 59.)  Stewart called his supervisor, Mary Word-Harris ("Word-Harris"), and told her what Robbins had told him. (*Id.*, p. 60.) Word-Harris advised that she would contact the Human Resources Department about how to proceed.  The next morning, Word-Harris met Stewart at a Chick-fil-a restaurant and advised that he should not return to the office until she had an opportunity to talk to Watson about her reasons for leaving. (*Id.*, pp. 62-64.)

At the end of the meeting, Word-Harris went to the Andalusia office.  In private, Word-Harris asked Watson if there were any other reasons why she was resigning and Watson said, "No." (Pl's Dep., p. 94-95, 97, 232.)  After Word-Harris asked Watson to send her an e-mail with her reasons for leaving, Watson sent the following message:

7

Mary,

This is the letter that you asked for.  I am leaving Lincare because my husband wants me to stay at home.

(Attach. to Schuetzler's Affid., Ex. 25.)

Lincare also conducted its own investigation.  Lincare representatives questioned other female employees in the office about whether any specific instances of sexual harassment had occurred during their employment.  (Schuetzler's Affid., p.8.)  The other female employees denied that they had witnessed or been subjected to any incidences of sexual harassment at Lincare.  (*Id*., p. 9; Defs' Exhs. 26 & 27.)

Around the time Watson submitted her letter of resignation and Lincare began its investigation, the employees in the Andalusia office were provided new telephones.  The phones had several different features, including the ability to record telephone conversations.  (Pl's Dep., p. 100.)  At one point, Stewart confronted Watson in front of her co-workers and accused her of recording a conversation he had with another person.  (*Id*., p. 101.)  Watson did not know how to use the phone's recording feature and denied that she had recorded Stewart's conversation.  (*Id*., pp. 100-101.)  Watson worked the remainder of the day and then left the office.

The following day, Watson did not return to work. (*Id*., p. 102.)  She called Robbins and asked her to retrieve her personal items from her desk, as well as the company handbook, and return them to her.  (*Id*., p. 102.)  Robbins gave Watson her personal items; Robbins, however, did not give Watson the company handbook.  (*Id*.)

8

On August 27, 2009, Watson submitted a charge of discrimination to the Equal Employment Opportunity Commission ("EEOC"), in which she complained that she was subjected to a sexually hostile work environment, quid pro quo harassment, and constructive discharge. (Pl's Ex. 3, p. 5.)  On February 24, 2010, the EEOC sent Watson a notice of right to sue in federal or state court.  (*Id.*, p. 2.)  Watson filed the instant lawsuit on May 21, 2010. (Doc. No. 1.)

## IV.  DISCUSSION

### A.  The Sexual Harassment Claims

Watson asserts that she was subjected to quid pro quo and hostile work environment sexual harassment as the result of Lincare's actions.[2]

Title VII prohibits discrimination on the basis of race, color, religion, sex, or national origin in a variety of employment practices.  *See Walker v. NationsBank of Florida, N.A.*, 53 F.3d 1548, 1555 (11th Cir. 1995).[3]  It is well-settled that an employer may be liable under

---

[2] In Count One of Watson's complaint, Watson asserts a Title VII claim against "Defendant."  It is well settled law that Title VII claims may not be brought against individual defendants.  *See, e.g., Shotz v. City of Plantation*, 344 F.3d 1161, 1174 n.20 (11th Cir. 2003) (noting that Title VII does not provide a remedy against individual defendants); *Smith v. Lomax*, 45 F.3d 402, 403 n.4 (11th Cir. 1995) (noting that individuals cannot be held liable under Title VII); *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) ("The relief granted under Title VII is against the *employer*, not individual employees whose actions would constitute a violation of the Act."); *Smith v. Alabama Dep't of Corr.*, 145 F.Supp.2d 1291, 1296 (M.D. Ala. 2001).  The court, therefore, assumes that the Title VII claims in this case are against Lincare, a corporate entity.

[3] Title 42 U.S.C.A. § 2000e-2(a)(1) provides: "It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such

Title VII for subjecting an employee to sexual harassment in the workplace. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65-66 (1986). The Eleventh Circuit has adopted a five-prong paradigm for analyzing sexual harassment claims. Specifically, the plaintiff must demonstrate that: (1) she is a member of a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment was severe or pervasive so as to alter the conditions of her environment and create a hostile or abusive working environment; and (5) there is a basis for employer liability. *Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 583 (11th Cir. 2000); *Mendoza v. Borden, Inc*., 195 F.3d 1238, 1245 (11th Cir. 1999); *Merriweather v. Ala. Dep't of Pub. Safety*, 17 F. Supp. 2d 1260, 1271 (M.D. Ala. 1998).

The plaintiff can pursue a claim of sexual harassment by either establishing that she was subjected to (1) a tangible employment action because she refused to submit to her supervisor's sexual advances, or (2) sufficiently severe or pervasive conduct that altered the terms and conditions of her employment to rise to the level of a hostile work environment. *See Hulsey v. Pride Restaurants, Inc*., 367 F.3d 1238, 1245 (11th Cir. 2004).

> In . . . [*Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742 (1998)] and . . . [*Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)], the Supreme Court indicated that courts should no longer use the labels "*quid pro quo*" and "hostile environment" to analyze whether an employer should be held liable on an employee's Title VII claim concerning a supervisor's sex-based harassment. Instead, when analyzing whether an employer should be held liable for a supervisor's harassment, courts should separate these cases into two groups: (1) harassment which culminates in a

---

individual's race, color, religion, sex or national origin."

"tangible employment action," such as discharge, demotion or undesirable reassignment, and (2) harassment in which no adverse "tangible employment action" is taken but which is sufficient to constructively alter an employee's working conditions.   Under this analysis, when a supervisor engages in harassment which results in an adverse "tangible employment action" against the employee, the employer is automatically held vicariously liable for the harassment.  In contrast, when the supervisor's harassment involves no adverse "tangible employment action," an employer can avoid vicarious liability for the supervisor's conduct by raising and proving the affirmative defense described in the *Faragher* and *Ellerth* cases ("*Faragher/Ellerth* affirmative defense").

*Frederick v. Sprint/United Management Co.,* 246 F.3d 1305, 1311 - 1312 (11th Cir. 2001) (internal citations and footnote omitted).  *See also Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1296 - 97 (11th Cir. 2000).  An employer is subject to vicarious and strict liability for a supervisor's sexual harassment that results in a tangible employment action.  *Cotton v. Cracker Barrel Old Country Store*, 434 F.3d 1227, 1246 (11th Cir. 2006).

    1.    **Tangible Employment Action**

Lincare argues that it is entitled to summary judgment on Watson's claim of tangible employment action sexual harassment because she has failed to establish a nexus between the harassing conduct and a job related reprisal.  Specifically, the defendant argues that there is no evidence that Watson's supervisor threatened her with a tangible employment action for refusing to respond to his advances.  Watson, however, argues that Stewart's threat that she could be terminated for recording a phone conversation establishes that she was threatened with a tangible employment action.

To prove tangible employment action sexual harassment in violation of Title VII, a the plaintiff must prove that the harassment culminated in a 'tangible employment action'

against her.  *Cotton*, 434 F.3d at 1231.  "A tangible employment action constitutes a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a *significant* change in benefits."  *Davis v. Town of Lake Park, Fl.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (quoting *Ellerth*, 524 U.S. at 760- 61 (emphasis in original)).  "There must also be a causal link between the tangible employment action and the sexual harassment."  *Cotton*, 434 F.3d at 1231 (11th Cir. 2006) (citing *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1312 (11th Cir. 2001)).

The court concludes that Watson has failed to establish a prima facie case of tangible employment action sexual harassment.  The record contains no evidence that Watson suffered a tangible employment action for refusing to respond to her supervisor's sexual demands. It is undisputed that Watson received annual raises and that she was never demoted, given undesirable assignments, threatened with losing her job, or otherwise punished based on her compliance or non-compliance with Stewart's alleged sexual advances and/or comments. (Pl's Dep. 84-86, 99-100, 127-28, 158, 164, 168-69.)  Although Watson argues that, after she filed her letter of resignation, Stewart falsely accused her of violating company policy by recording a telephone conversation[4] and threatened that she could be terminated for his behavior, there is simply no evidence of a causal connection between Stewart's statement that she could be terminated and the alleged incidents of sexual harassment.

---

[4]The conversation was between Stewart and an employee of another company about Stewart's vacation.  There was nothing improper about the contents of the conversation.

Watson attempts to link the conversation recording accusation with Stewart's alleged sexual harassment and show that this scenario is sufficient to establish the requisite tangible employment action.  It is undisputed that Stewart was aware that Watson had accused him of sexual harassment when he confronted her about the recording.  (Stewart Dep., pp. 55, 82)  After ascertaining to his satisfaction that Watson did record his conversation, Stewart confronted her outside his office.  (*Id.*, p. 78)  She denied making the recording.  (*Id.*, p. 79)  Watson worked the remainder of the day but never returned to work.  (*Id.*, p. 81)  The same day of the confrontation, Stewart reported his belief about Watson recording his conversation to Human Resources.  (*Id.*, p. 82-83)  Stewart believed the recording was an offense for which Watson could be terminated, but he intended to allow Human Resources to handle the matter.  (*Id.*)  All of this happened after Watson had submitted her resignation.  Moreover, there is no evidence before the court showing that Human Resources or anyone else for that matter took any adverse action against Watson based on this incident.  Indeed, Watson admitted that neither Stewart nor anyone else ever threatened her with the loss of her job.  (*Id.*, p. 113)  In an affidavit filed in support of her opposition to summary judgment, Watson states that after the confrontation, she "did not come back to work because I knew that Stewart was going to have me terminated."  This, of course, is rank speculation unsupported by any facts and is insufficient to establish a genuine dispute of fact.  This court therefore concludes that Watson has failed to establish a genuine dispute of material fact regarding the existence of a tangible employment action and a causal connection between a tangible employment action and the

13

alleged incidents of sexual harassment.   Consequently, Lincare's motion for summary judgment with respect to this tangible employment action sexual harassment claim is due to be granted.

### 2.  Hostile Work Environment

Under the law of this circuit, an employee establishes a prima facie case of hostile work environment by demonstrating:  (1) that she is a member of a protected class; (2) that she was subjected to unwelcome conduct; (3) that the conduct was on the basis of sex; (4) that the conduct affected a term or condition of employment; and (5) a basis for holding the employer liable.  *See generally Gupta v. Florida Bd. of Regents*, 212 F.3d 571 (11th Cir. 2000);  *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (*en banc*).

The court concludes that Watson has failed to establish a prima facie case of hostile work environment because there is no basis for holding Lincare liable.  Before making this determination, the court must consider the employee's subjective perception of the alleged harassment and determine whether the alleged harassment objectively altered the terms and conditions of Watson's employment.  *See Mendoza*, 195 F.3d at 1246.  As a guideline for assessing this objective standard, courts consider four non-exhaustive factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance;  and (4) whether the conduct unreasonably interferes with the employee's job performance.  *Id.*

"To constitute an actionable hostile environment, conduct must be ... 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).  While racially or sexually derogatory or demeaning comments are abhorrent, the law clearly "prohibits only harassing behavior that is so severe or pervasive as to render the workplace objectively hostile or abusive." *Blevins v. Heilig-Meyers Corp.*, 52 F.Supp.2d 1337 (M.D. Ala. 1998) (citing *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997)), *aff'd by* 184 F.3d 825 (11th Cir. 1999).

Although Title VII clearly prohibits discrimination based on race and sex, "Title VII is not a federal 'civility code.'" *Mendoza*, 195 F.3d at 1245.  As one court aptly noted, "Title VII is not a federal guarantee of refinement and sophistication in the workplace.... [I]t prohibits only harassing behavior that is so severe or pervasive as to render the workplace objectively hostile or abusive." *Blevins v. Heilig-Meyers Corp.*, 52 F.Supp.2d 1337 (M.D. Ala. 1998).  Moreover, if an employee "does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris*, 510 U.S. at 21-22.

In this case, Watson alleges that the following incidents constitute a hostile work environment:

- Employees, including Stewart, would occasionally slap each other on the backside in a manner similar to football players on the sidelines.  (Pl's Dep., p. 145.)

15

- On one occasion in his office in 2006 or 2007, Stewart pulled up Watson's shirt and began fondling and sucking on her breasts and commented that they were pretty.  (*Id.*, p. 152.)

- At some point before March 2008, Stewart sat in an office chair next to Watson and placed his hand on her upper thigh.  (*Id.*, p. 165.)

- In early 2007, Stewart suggested that he and Watson could have sexual intercourse on a hospital bed in the office.  (*Id.*, pp. 131-132.)

- On two occasions after moving into the office in March 2008, Stewart kissed Watson on her mouth.  (*Id.*, pp. 135, 137-139.)

- On three other occasions, Stewart called Watson into his office and fondled her breasts.  (*Id.*, p. 150.)

- Stewart talked about Watson's breasts on several occasions.  (*Id.*)

- In June 2008, Stewart told Watson that she could come over to his house and have sex with him because his wife and children were at church camp.  (*Id.*, pp. 124-125.)

- After submitting her letter of resignation, Stewart told Watson that "it would be hard to replace somebody that has as pretty titties as [she] had."  (*Id.*, 121.)

For the purposes of this opinion, the court will assume *arguendo* that the facts as alleged by Watson establish a hostile work environment.  However, the court is constrained to conclude that the *Faragher-Ellerth* defense is applicable in this case.  As previously discussed, Watson did not suffer any harassment by her supervisor which resulted in any "tangible employment action," such as discharge, demotion or undesirable reassignment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus. v. Ellerth*, 524

U.S. 742, 761-63 (1998).  Thus, in a case such as this, a defendant avoids liability if: (1) the employer "exercised reasonable care to prevent and correct promptly any sexually harassing behavior";  and (2) the employee "unreasonably failed to take advantage of any preventive or corrective opportunities . . . provided." *Faragher*, 524 U.S. at 807; *Burlington Indus.*, 524 U.S. at 765.  Because it is an affirmative defense, the defendant bears the burden of establishing both of these elements. *See Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1303 (11th Cir. 2007) (citing *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1313 (11th Cir. 2001).

Watson does not dispute that Lincare has a valid anti-discrimination policy which prohibited harassment.  There is also no dispute that Watson was aware of reasonable reporting procedures and requirements and that she did not call the complaint hotline or otherwise complain to Lincare's Human Resources Department or management about Stewart's behavior.  Thus, Watson failed "to take full advantage of [Lincare's] preventative measures." *Baldwin*, 480 F.3d at 1306-07.  The court therefore concludes that Lincare has established both elements of the *Faragher-Ellerth* defense.

Watson argues that the *Faragher-Ellerth* defense is not available in this case because she was constructively discharged from her position at Lincare.  Watson cites *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004), for the proposition that an employer may not assert the *Faragher-Ellerth* defense when a supervisor's act precipitates a constructive discharge.  Specifically, Watson asserts that Lincare is strictly liable for the alleged

17

harassment because Stewart's accusation that she recorded a telephone conversation in violation of company policy precipitated her constructive discharge before the expiration of the two-week notice date in her resignation letter.  In *Suders*, the Court determined that "an employer does not have recourse to the *Faragher-Ellerth* affirmative defense when a supervisor's *official* act precipitates the constructive discharge; absent such a 'tangible employment action,' however, the defense is available to the employer whose supervisors are charged with harassment."  542 U.S. at 140-141. (Emphasis added.)  In this case, there is no evidence that Stewart engaged in an official act which precipitated Watson's decision to leave her employment.  Although Watson alleges that Stewart accused her of committing a dischargeable offense, *i.e.* recording a telephone conversation, there is no evidence that he engaged in any official act to terminate, demote, or otherwise exercise company authority which precipitated a constructive discharge under Title VII.  Thus, the court concludes that Lincare may assert the *Faragher-Ellerth* defense in this case.

Lincare gave Watson numerous opportunities to report any incidences of harassment in person or anonymously.  Nonetheless, Watson did not avail herself of any of the repeated opportunities to complain to Lincare about any incidents of sexual harassment.  Consequently, Lincare is protected by the *Faragher-Ellerth* affirmative defense.  Based on the foregoing, the court concludes that Lincare is entitled to summary judgment with respect to Watson's claims of sexual harassment.

## B.  State Law Claims

The remaining claims in this case are state law claims of invasion of privacy, assault and battery, the tort of outrage, and negligent supervision.  A federal district court may exercise subject matter jurisdiction over a civil action in which only state law claims are alleged if the civil action arises under the federal court's diversity jurisdiction.  *See* 28 U.S.C. § 1332(a)(1).  The diversity statute confers jurisdiction on the federal courts in civil actions "between citizens of different states," in which the jurisdictional amount is met.  *Id.*  To satisfy diversity, not only must a plaintiff be a citizen of a state other than the state of which one defendant is a citizen, but also, under the rule of "complete diversity," no plaintiff may share the same state citizenship with any defendant. *See Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806).  The complaint indicates that both Watson and Stewart are citizens of the State of Alabama.  Thus, there is no basis for diversity jurisdiction.  *See* 28 U.S.C. § 1332.

Consequently, the court's exercise of supplemental jurisdiction over the remaining state law claims is discretionary.  Under 28 U.S.C. § 1367(c)(3), the court may "decline to exercise supplemental jurisdiction over a [state law] claim if the district court has dismissed all claims over which it has original jurisdiction. . . . "  The court's discretion is advised by *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966), in which the Court held that

> [n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even

> though not insubstantial in a jurisdictional sense, the state claims
> should be dismissed as well.

*Id*. at 726.  And, in *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343 (1988), the Supreme

Court reiterated that "when the federal-law claims have dropped out of the lawsuit in its early

stages and only state-law claims remain, the federal court should decline the exercise of

jurisdiction by dismissing the case without prejudice . . . "  Accordingly, the court concludes

that the state law claims are due to be dismissed without prejudice.


## VI.  CONCLUSION

Accordingly, it is

ORDERED that the defendants' motion for summary judgment (Doc. No. 32) be and

is hereby GRANTED and that the sexual harassment claims be and are hereby DISMISSED

with prejudice.  It is further

ORDERED that the state law claims of invasion of privacy, assault and battery, the

tort of outrage, and negligent supervision be and are hereby DISMISSED without prejudice.

The court will enter a separate final judgment.

Done this 27th day of July, 2011.


_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE

20